UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. _______-Civ-________

ROBERT L. KALINSKY, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

DELAWARE LIFE INSURANCE COMPANY; CLEAR SPRING LIFE AND ANNUITY COMPANY; GROUP 1001 INSURANCE HOLDINGS, LLC; GROUP 1001, INC.; TWG GLOBAL HOLDINGS, LLC; GUGGENHEIM PARTNERS, LLC; and MARK WALTER,

Defendants.

______________________________________/ DEMAND FOR JURY TRIAL

CLASS ACTION COMPLAINT

Plaintiff Robert L. Kalinsky ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Delaware Life Insurance Company ("Delaware Life"); Clear Spring Life and Annuity Company ("Clear Spring"); Group 1001 Insurance Holdings, LLC and Group 1001, Inc. (collectively, "Group 1001"); TWG Global Holdings, LLC ("TWG"); Guggenheim Partners, LLC ("Guggenheim"); and Mark Walter ("Walter") (collectively, "Defendants"), and alleges the following based upon personal knowledge as to Plaintiff's own acts and experiences, and upon information and belief as to all other matters, based upon counsel's investigation, including review of statutory financial statements, regulatory examinations and filings, Plaintiff's annuity files, rating-agency materials, and public reporting concerning Defendants:

## NATURE OF THE ACTION

1. This is a class action on behalf of persons and entities who purchased or exchanged into annuities issued by Delaware Life and/or Clear Spring during the Class Period (defined below), including multi-year guaranteed annuities, fixed annuities, fixed index annuities, and associated riders and endorsements (collectively, the "Annuities"). Defendants uniformly represented that the Annuities' guarantees were backed by the issuing insurer's financial strength and claims-paying ability while reporting, or causing others to report, that only a small fraction of invested assets were affiliated or related-party investments.

2. In truth, Delaware Life and Clear Spring had concentrated substantial portions of their general-account assets in private-credit investments whose returns were predominantly contingent on Walter-related affiliates. Delaware Life later reported affiliated assets of approximately 42% of general-account invested assets at December 31, 2025, while Clear Spring restated approximately 59%—rather than the small single-digit percentages previously reported.

3. Plaintiff brings claims under Indiana common law on behalf of the Nationwide Class (defined below) for fraudulent concealment, breach of contract and the implied covenant of good faith and fair dealing, fraud in the inducement, negligent misrepresentation, aiding and abetting fraud, civil conspiracy, unjust enrichment, and declaratory relief. He brings Count VIII under the Florida Securities and Investor Protection Act, Florida Statutes §§517.301 and 517.211, solely for himself and the Florida Subclass (defined below). The Florida Insurance Code, including Part IX of Chapter 626, §§626.9541(1)(a), (b), (e), and (l), 626.9641, 626.99, and 627.4554, supplies duties and standards of conduct for the Florida Subclass.

4. Defendants directly and/or in concert induced Plaintiff and Class Members to purchase or exchange into Delaware Life and Clear Spring annuity products by emphasizing guaranteed income, principal protection, fixed rates, index-linked benefits, and other benefits backed by the issuing insurer's financial strength and claims-paying ability. Defendants also relied on credit ratings and statutory filings that did not disclose the true affiliated concentration.

5. Those guarantees were not backed by any segregated fund or collateral dedicated to Plaintiff and Class Members. They were long-dated promises payable from the Issuer Defendants' (defined below) general accounts. The composition of those accounts was therefore material: the bargain depended on whether the assets were diversified and independently valued or concentrated in illiquid loans to Walter-related businesses.

6. Upon information and belief, Defendants made materially identical representations regarding financial strength and claims-paying ability to purchasers of Delaware Life's TruePath Income, APEX MYGA, Growth Pathway, and other fixed index, multi-year guaranteed, fixed, and variable Annuities, and to purchasers of Clear Spring's Preserve Multi-Year Guaranteed Annuity,

its ClearFlex, ViStar, Highlander, and Highlander 7 fixed index annuities, its Provider single premium immediate annuity, and other Annuity products.[1,2]

7. Defendants intentionally concealed the truth about the Issuer Defendants' exposure to Walter-related parties. Delaware Life previously reported related-party investments as approximately 3% to 4% of assets, while Clear Spring reported a similarly small amount and later restated a materially larger concentration. After federal subpoenas in February 2026 and internal reviews, the Issuer Defendants disclosed that their financial statements required significant correction.

8. The corrected figures are staggering. Delaware Life disclosed approximately $16.37 billion of private-credit investments at December 31, 2025 whose returns were predominantly contingent on affiliates, plus direct affiliated, funding-agreement, and trust-note structures. Clear Spring's September 21, 2026 update reported affiliated assets of $5.895 billion against $9.923 billion of general-account invested assets, or 59%, at December 31, 2025 (restated); $5.323 billion against $10.142 billion, or 52%, at March 31, 2026; and $4.898 billion against $10.033 billion, or 49%, at June 30, 2026.

9. The concealed assets were not ordinary diversified holdings. Much of the exposure consisted of nominally unaffiliated investments whose repayment depended predominantly on Walter-related parties. The structure made the portfolios appear diversified while tying

---

[1] *See* Delaware Life Ins. Co., *All Annuities*, https://www.delawarelife.com/our-products/all-annuities-page (last visited Sept. 30, 2026); Clear Spring Life and Annuity Co., *Product Center*, https://clearspringlife.com/product-center (last visited Oct. 1, 2026).

[2] Delaware Life's variable annuities are registered with the U.S. Securities and Exchange Commission ("SEC") and are securities under the federal securities laws; the Florida securities allegations are pleaded under Chapter 517, Florida Statutes, as stated in Count VIII.

policyholder-backing assets to one man's business empire. Clear Spring's restated affiliated assets were approximately five times its reported total capital and surplus, and Delaware Life's comparable exposure was several times its capital and surplus.

10. The Annuities carried surrender charges, Market Value Adjustments, and withdrawal restrictions that made early exit costly. Plaintiff and Class Members therefore could not simply withdraw retirement assets after learning that the financial-strength representations rested on materially misstated portfolios.

11. Each Issuer Defendant's standardized contract materials included a 30-day right to examine and receive a return of premium, subject to the applicable policy terms and state law. Defendants continued to sell and deliver Annuities after receiving the February 2026 subpoenas without disclosing them before purchasers' refund periods expired.

12. The Issuer Defendants did not disclose the subpoenas and restate financial information until June 26, 2026, four months later. Plaintiff seeks relief on behalf of purchasers who have surrendered one or more Annuities and purchasers who continue to hold one or more Annuities in force. Plaintiff himself falls into both groups: he surrendered one of his three Annuities after the disclosures and continues to hold the other two.

13. Plaintiff seeks rescission and return of premiums paid or applied without surrender charges, Market Value Adjustments, or other penalties; restitution of amounts already deducted; compensatory and punitive damages; declaratory and injunctive relief; and all other available remedies.

**PARTIES**

14. Plaintiff Robert L. Kalinsky is a natural person who resides in Davie, Florida 33331, in Broward County, and is a citizen of Florida. He was born in November 1950 and is a

"senior consumer" within the meaning of Florida's annuity-suitability statute. Plaintiff purchased three Annuities issued by Delaware Life and Clear Spring during the Class Period, as alleged below.

15. Defendant Delaware Life Insurance Company is a life insurer organized under Delaware law with its principal place of business at 10555 Group 1001 Way, Zionsville, Indiana 46077. Delaware Life is a citizen of Delaware and Indiana, is licensed in every state except New York, and issues annuity contracts and insurance products. It is controlled through Group 1001 and TWG by Walter and held approximately $69 billion in assets as of March 2026.

16. Defendant Clear Spring Life and Annuity Company (National Association of Insurance Commissioners ("NAIC") No. 83607) is a Delaware stock life insurer with administrative offices at 10555 Group 1001 Way, Zionsville, Indiana 46077, and is a wholly owned subsidiary of Group 1001 Insurance Holdings, LLC. Clear Spring is a citizen of Delaware and Indiana. It was formerly Guggenheim Life and Annuity Company and originally Kansas City Variable Life Company, formed in 1985; Group 1001 acquired it through CSLIC Holdings, LLC effective November 12, 2021, and it was renamed Clear Spring on May 31, 2022. Clear Spring is ultimately controlled by Walter, is licensed in every state except New York, and has approximately $16 billion in total assets according to *Bloomberg*, including approximately $10.033 billion of general-account invested assets as of June 30, 2026. Clear Spring sold more than $747 million in direct individual annuity premiums in 2024. It markets its Annuities directly to consumers planning for retirement, describing itself as focused on "principal protection, tax-deferred accumulation, and retirement income" through "relatively simple, understandable product designs." Its contracts state that they are signed at its office in Indianapolis, Indiana and it services contracts from P.O. Box 80509, Indianapolis, Indiana.

17. Defendants Group 1001 Insurance Holdings, LLC and Group 1001, Inc. are, respectively, a Delaware limited liability company and a Delaware corporation, each with its principal place of business at 10555 Group 1001 Way, Zionsville, Indiana. Each is a citizen of Delaware and Indiana. They own and direct the Group 1001 insurance enterprise, including Delaware Life and Clear Spring, and issue public statements and rating-agency communications concerning the insurers.

18. Defendant TWG Global Holdings, LLC is a Delaware limited liability company with principal places of business in New York, New York and Chicago, Illinois. TWG is the holding company through which Walter controls Delaware Life, Clear Spring, Group 1001, and his stake in Guggenheim. TWG agreed to acquire or exchange reclassified insurer assets under remediation plans targeting substantial reductions in affiliated holdings.

19. Defendant Guggenheim Partners, LLC is a Delaware limited liability company with its principal place of business in New York, New York and a principal office in Chicago, Illinois. It is an asset-management firm with approximately $362 billion in assets under management. Guggenheim and its affiliate, Guggenheim Partners Investment Management, LLC ("GPIM"), managed or advised insurer portfolios and, upon information and belief, directed investments toward Walter-related entities.

20. Defendant Mark Walter is an individual, the CEO and co-founder of Guggenheim, and the CEO and Co-Chairman of TWG. Through TWG and Group 1001, Walter controls Delaware Life and Clear Spring. Walter is a citizen of Illinois and owns property in Florida.

21. Delaware Life and Clear Spring are referred to collectively as the "Issuer Defendants" or the "Insurers." Defendants other than the Issuer Defendants are referred to collectively as the "Non-Issuer Defendants."

22. Additional third parties, affiliated entities, and other persons are presently unidentified, including, but not limited to, Egan-Jones Ratings Company ("Egan-Jones"), KPMG LLP ("KPMG"), ABS Capital ("ABS"), Amistad Financial ("Amistad"), Bradford Allen, and Hudson Trading Inc. ("Hudson Trading"). Plaintiff identifies them only as potential Unnamed Co-Conspirators, does not name them as defendants at this time, and reserves the right to amend this complaint.

23. For purposes of the Class Action Fairness Act, an unincorporated association such as a limited liability company is a citizen of the state where it has its principal place of business and the state under whose laws it is organized. 28 U.S.C. §1332(d)(10).

**JURISDICTION AND VENUE**

24. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because this is a class action involving more than 100 putative Class Members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Plaintiff is a citizen of Florida and is diverse from every Defendant, including Delaware Life and Clear Spring, each a citizen of Delaware and Indiana, and the Non-Issuer Defendants. The Court also has authority to grant declaratory relief under 28 U.S.C. §§2201-2202.

25. This Court has personal jurisdiction over each Defendant under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and Florida Statutes Section 48.193. Defendants transacted business in Florida, directed Annuity solicitations and standardized materials into Florida, contracted to insure Florida residents and risks, and committed or caused tortious acts in Florida. Walter also owns property in Florida.

26. Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Broward County. The

Annuities were solicited and delivered in Broward County, Plaintiff resides there, and Defendants conduct substantial business in this District. Broward County is within the Fort Lauderdale Division under 28 U.S.C. §89(c).

## FACTUAL ALLEGATIONS

### Delaware Life's and Clear Springs's Status as Authorized Insurers and the Duties the Law Imposes on Defendants

27. Delaware Life and Clear Spring are life insurers authorized to transact insurance business in Florida and throughout the United States except New York. They are subject to the Florida Insurance Code and oversight by the Florida Office of Insurance Regulation ("FOIR") and Department of Financial Services ("DFS").

28. Group 1001, TWG, and Walter control or direct the Issuer Defendants, and Guggenheim and GPIM manage or advise their investment portfolios. The Issuer Defendants and their affiliates acted through standardized forms, agents, investment managers, and public filings.

29. As authorized Florida insurers, the Issuer Defendants are subject to Part IX of Chapter 626, Florida Statutes. Florida law prohibits false or misleading representations in connection with insurance, misrepresentations concerning an insurer's financial condition, and knowingly filing false material statements with supervisory officials. The same standards apply to persons acting on an insurer's behalf.

30. Florida Statutes Section 627.4554 requires an insurer to have a reasonable basis to believe an annuity is suitable and to inform the consumer of its features; replacement transactions require evaluation of new surrender periods and lost benefits. Section 626.99 requires an unconditional refund period for annuity contracts. The materials delivered to Plaintiff included Florida-specific specifications, replacement disclosures, and a right to examine the contracts.

31. The same duties exist in materially similar form in the states where Defendants sold the Annuities. Indiana, from which Delaware Life and Group 1001 directed substantial conduct, prohibits unfair and deceptive insurance practices at Indiana Code Section 27-4-1-4. The Nationwide Class claims rely on Indiana common law, while Florida statutory claims are limited to the Florida Subclass.

32. The reported affiliated concentration came from mandatory statutory accounting and insurance holding-company disclosures. The Issuer Defendants were required to identify affiliate and related-party investments under applicable holding-company laws and NAIC Statements of Statutory Accounting Principles ("SSAP"), including SSAP No. 25, in schedules, notes, and historical data filed with regulators and relied upon by rating agencies.

33. The Issuer Defendants repeatedly represented that the Annuities' guarantees were backed by their financial strength and claims-paying ability. Their concealment of affiliated investments—approximately 42% for Delaware Life and 59% for Clear Spring at year-end 2025—made those representations materially misleading and directly affected the value and security of the guarantees.

**Background on Defendants' Annuities and Portfolio Scheme**

34. Based on public reports, regulatory filings, and the Issuer Defendants' disclosures, Delaware Life and Clear Spring steered substantial policyholder premiums and other general-account assets into private-credit investments tied to Walter's broader business empire.

35. Guggenheim and GPIM, where Walter serves as CEO and which managed the Insurers' portfolios, were the affiliates that introduced, originated, structured, managed, or valued the private-credit investments now under investigation. GPIM's investment-management

relationship with the Insurers was a related-party relationship even when filings described portions of the portfolio as unaffiliated.

36. For years, Delaware Life represented in statutory filings and materials that only approximately 3% to 4% of its investments were affiliated or related-party investments. Clear Spring likewise reported for years a small affiliated concentration before its later restatement. These representations were material to purchasers whose guarantees depended on the financial strength of the Issuer Defendants.

37. After federal grand jury subpoenas were served in early February 2026, Delaware Life and Clear Spring purportedly conducted internal reviews and disclosed material corrections on June 26, 2026. Delaware Life reported approximately $16.37 billion of private-credit investments predominantly contingent on affiliates at December 31, 2025; Clear Spring later reported $5.895 billion of affiliated assets, or 59% of general-account invested assets, at the same date.

38. Upon information and belief, Delaware Life's corrected statutory statement, filed in June 2026 and moving billions of dollars of investments from the unaffiliated to the affiliated column, was submitted over the sworn attestation of the company's officers, the first of whom was Daniel Jonathan Towriss ("Towriss"), the Chief Executive Officer ("CEO") of Group 1001. Group 1001 holds approximately $76 billion of annuity money belonging to roughly half a million people. Towriss's compensation and any equity interest he holds have never been publicly disclosed.

39. Delaware Life's disclosed figures included approximately $9.53 billion of affiliate-contingent private credit at December 31, 2024, approximately $16.37 billion at December 31, 2025, and approximately $16.82 billion at June 30, 2026, together with funding-agreement and trust-note structures whose repayment likewise depended predominantly on affiliates. Public

reporting described the combined loans at issue across the two insurers as approximately $20 billion to $21 billion. According to Fitch, as reported by the *Los Angeles Times*, the two Insurers had reported approximately $1 billion of related-party loans but, after their internal reviews, found that approximately $21 billion in loans should have been recorded as extended to related parties, and company executives told Fitch "they were unaware they were making related-party loans."

40. The considerable under-reporting extended back to at least 2019. Delaware Life's five-year historical data reported investments in parents, subsidiaries, and affiliates of approximately $1.526 billion in 2019, $1.472 billion in 2020, $2.124 billion in 2021, $1.661 billion in 2022, and $1.697 billion in 2023, against total admitted assets of approximately $37.831 billion, $41.747 billion, $44.381 billion, $41.180 billion, and $46.091 billion, respectively—approximately 3.5% to 4.8%. Its notes separately reported affiliated and related-party investments, with combined reported amounts of approximately $1.607 billion in 2022, $1.774 billion in 2023, and $2.245 billion in 2024.

41. The notes repeatedly reported no detail of material related-party transactions outside Schedule Y. The corrected 2024 disclosures increased general-account related-party investments, excluding subsidiaries, from approximately $2.262 billion to $11.559 billion. At December 31, 2025, Delaware Life's restated exposure was approximately $17.88 billion, or roughly 39% of total admitted general-account assets and approximately 4.7 times capital and surplus. Delaware Life's later update stated that affiliated assets were $18.251 billion of $43.883 billion of invested assets, or 42%, at December 31, 2025, and $19.148 billion of $49.336 billion, or 39%, at June 30, 2026.

42. The structures included Bradford Allen, Amistad, and other intermediaries. Delaware Life held Bradford Allen Secured Funding and made loans to Bradford Allen entities,

and invested in Amistad Merchant Funding while making short-term loans to Amistad entities. Upon information and belief, those investments were reported as unaffiliated even though repayment depended on Walter-related parties.

43. Delaware Life's largest exposures included Clarus Capital, PDIF GCF CLO Issuer, MCAF Fund, Red Oak Inventory Finance, American Media Productions LLC ("American Media"), and Whitney Funding. *The Wall Street Journal* reported that two of the three largest debt holdings were affiliated loans and that the third had longstanding business ties to Guggenheim. PDIF GCF CLO 2022-1 was managed by Guggenheim Corporate Funding, and, upon information and belief, Delaware Life owned its entire capital structure.

44. *The Wall Street Journal*'s September 28, 2026 analysis found that Delaware Life's private-credit holdings grew from approximately 9% of debt investments in 2014 to approximately 45% of nearly $42 billion in debt investments, that about 80% of identified affiliated loans with ratings were rated at or below BBB, and that Delaware Life drew approximately 97% of its Federal Home Loan Bank credit line in 2025, leaving near-zero capacity if it faced a cash crunch.

45. The concealed concentration was material because it exposed policyholder assets to illiquid, related-party credit and limited the Insurers' liquidity. The structures also obscured the identity of borrowers and the economic connections among them. No Annuity purchaser could reasonably reconstruct the true exposure from the statutory filings Defendants controlled.

**Clear Spring Likewise Under-Reported Its Affiliated Investments**

46. Like Delaware Life, Clear Spring's September 21, 2026 website update, "Information About Affiliated Investments Reduction Plan & Control Remediation Plan," states that the company disclosed on June 26, 2026, in its 2025 audited statements and first-quarter 2026 quarterly statements, that a material portion of private credit previously reported as unaffiliated

should have been classified as affiliated. The update states that the disclosure followed a Southern District of New York grand jury subpoena received in early February 2026 and a parallel SEC investigation.

47. Clear Spring further stated that the returns on the reclassified investments were predominantly contingent on affiliate performance and that, "once the misclassification was discovered, Clear Spring concluded deficiencies existed in internal control over financial reporting because it did not identify the related-party issue on a timely basis." It stated that a Control Remediation Plan has been accepted by its independent audit committee, targeting completion before the December 31, 2026 statutory filing. Its table reported affiliated assets of $5,895 million against $9,923 million of general-account invested assets, or 59%, at December 31, 2025 (restated); $5,323 million against $10,142 million, or 52%, at March 31, 2026; and $4,898 million against $10,033 million, or 49%, at June 30, 2026. Statutory filings confirm that Clear Spring's affiliated investments moved from $5,894,580,687 to $4,897,742,722, a reduction of $996,837,965, or from 59.4% to 48.8% of invested assets.

48. The update's footnote states that the restated December 31, 2025 amounts reflect additional related-party investments disclosed in Clear Spring's 2025 audited financial statements that were omitted from its 2025 Annual Statement. The update also describes a TWG Asset Purchase Agreement targeting approximately 10% affiliated assets by June 30, 2027, subject to regulatory approval. Clear Spring's home page now directs every prospective and current policyholder to "Clear Spring Life's Affiliated Investments Reduction Plan and Control Remediation Plan," an acknowledgment that the composition of its general account required a public remediation plan. Group 1001 also filed a plan with the Delaware Department of Insurance to eliminate affiliated exposure.

49. Thus, ***more than half*** of Clear Spring's general-account invested assets were affiliated at year-end 2025 and at March 31, 2026, while Clear Spring was under subpoena and continuing to sell Annuities. Public analysis titled, *Mispriced Assets*, dated August 24, 2026, reported that Clear Spring's 2025 annual statement listed only approximately $3.7 million of affiliated bonds on General Interrogatory 13.2, while the restated figure was approximately $3.8 billion ($3,804,926,940)—***an increase of roughly 1,000-fold***. Similarly, Clear Spring's originally filed year-end 2025 investments in parents, subsidiaries, and affiliates were only $458,518,408, against a restated $5,894,580,687—a roughly ***13-fold*** understatement. Plaintiff alleges these facts on information and belief.

50. The Delaware Department of Insurance examination report for Clear Spring as of December 31, 2023, adopted June 23, 2025, shows cash and invested assets of approximately $10.35 billion and total capital and surplus of approximately $1.16 billion. The report identifies KPMG as Clear Spring's auditor. The restated affiliated assets of approximately $5.9 billion were roughly ***five times*** capital and surplus. The examination covering 2020-2023 and the prior examination of Guggenheim Life and Annuity as of December 31, 2019, covering 2016-2019, reported no significant findings or changes, indicating that ***regulators were misled throughout***. Clear Spring paid dividends of approximately $25 million in 2020, $74.3 million in 2021, $100 million in 2022, $166 million in 2023, and $150 million in 2024. Upon information and belief, Clear Spring, holding approximately $1.2 billion of surplus, paid its stockholders a further $135 million in dividends in 2025, while carrying assumed reinsurance liabilities from the same counterparties identified in the 2014 policyholder lawsuit equal to approximately 142% of that surplus.

51. Upon information and belief, Delaware Life paid approximately $30 million of interest on surplus notes at a rate of 8.625%, whose holders include an entity that Delaware Life's own filing identifies as an affiliate and a trust named for the executive whom Towriss replaced as CEO. The fees Guggenheim is paid to manage the Insurers' portfolios do not appear in Delaware Life's annual statement.

52. Clear Spring's history extends back to at least 2019, when it operated as Guggenheim Life and Annuity and its investments had been managed by GPIM since 2009. Upon information and belief, the same structures and intermediaries that affected Delaware Life affected Clear Spring from at least January 1, 2019, but likely much earlier. Clear Spring has restated only 2025 figures; the extent of earlier misclassification is within Defendants' exclusive knowledge. *Bloomberg* reporting on August 18, 2026, published through Quartz, separately reported that Clear Spring reduced related transactions by approximately $90 million.

53. *The Wall Street Journal* reported that Clear Spring annuity holder Rick Phillips was swearing off annuities and that the federal probe focused on approximately $20 billion of investments by Delaware Life and Clear Spring that were not properly marked affiliated. AM Best's July 31, 2026 release and Clear Spring rating disclosure affirmed an A- rating but revised the outlook from positive to negative for Delaware Life and Clear Spring, citing a significant decline in risk-adjusted capitalization due to affiliated holdings previously identified as non-affiliated, a deficiency in management controls, and potential regulatory risk if charges were brought by prosecutors. AM Best stated that "the recent identification of affiliated investment holdings that were previously reported as unaffiliated points to a deficiency in management controls," and that "the negative outlooks reflect the group's decline in risk-adjusted capitalization

following the federal investigation into affiliated assets being previously reported as unaffiliated." Even so, TWG publicly asserted that "there has been no fraud" at Delaware Life and Clear Spring.

54. Upon information and belief, AM Best cut its outlook on all three Group 1001 life insurers within days of the public disclosure of the grand jury investigation, and Fitch described the restated affiliated exposure as the ***highest it has ever rated in a North American life insurer***.

**Defendants Were on Notice: The Same Conduct Was Alleged Against Walter's Insurers in 2014**

55. In February 2014, policyholders of insurers then controlled by Walter and Guggenheim filed a class action lawsuit alleging that policyholder funds financed Walter's and Guggenheim's 2012 acquisition of the Los Angeles Dodgers, that the use of those funds was not disclosed in regulatory filings, and that the insurers obscured affiliated investments. The complaint was voluntarily dismissed without prejudice the next day. Public reporting states that the forensic accountant whose work underpinned that complaint later provided it to federal prosecutors. The prior allegations put Walter and his companies on notice that policyholder funds and affiliated investments could no longer be concealed from regulators and policyholders.

56. The 2014 complaint alleged that billions of dollars of policyholder money had been moved to affiliates, more than $1 billion of it into the Dodgers purchase, and that the resulting shortfall was masked through reinsurance ceded to Heritage Life, which the insurers represented in their regulatory filings to be unaffiliated. According to Heritage Life's own statutory filings, reprinted in that complaint, Towriss was simultaneously Heritage Life's Chief Risk Officer ("CRO"), Chief Actuary, Secretary, and a Director while serving as President and CEO of Guggenheim Life, one of the ceding insurers, and Heritage Life's administrative office was Guggenheim Life's own address in Indianapolis. Using only public documents, that complaint calculated approximately $445 million of dividends and $273 million of fees leaving the insurers

over three years. Although that complaint was dismissed without adjudication, Delaware Life continues to cede a block of structured settlements to Heritage Life of Arizona, the same charter, under a reinsurance treaty signed in 2020, and Delaware Life's current annual statement answers "No" to the interrogatory asking whether any reinsurer listed as non-affiliated is controlled, directly or indirectly, by the reporting entity or its affiliates. Plaintiff pleads these reported facts on information and belief.

**Federal Investigations, Rating Actions, and Market Reaction**

57. Federal prosecutors in the Southern District of New York and the SEC are investigating whether Delaware Life, Clear Spring, Guggenheim, Walter, or related entities concealed that private-credit investments backed other parts of Walter's business empire. The subpoenas were received in February 2026 but disclosed only on June 26, 2026, after the Issuer Defendants continued for four months soliciting, issuing, and delivering Annuities.

58. The *Financial Times* reported previously unreported flows across Walter's empire, a race to divest more than $20 billion in misclassified insurer investments, and scrutiny of a complex web of assets funded by U.S. retirees. The *Financial Times* also reported that a whistleblower questioned how Guggenheim Private Investments booked approximately $275 million of revenue for services purportedly provided by Walter-linked entities, including Amistad Capital Funding. The concerns went to federal prosecutors and KPMG, which warned of shortcomings in revenue recognition but nonetheless issued clean opinions. In response to the investigations, Walter reportedly offered to pledge his Guggenheim equity as collateral for short-term TWG financing, and public reporting connected asset sales, including the Lakers and a stake in Chelsea Football Club, to remediation efforts.

59. In August 2026, TWG agreed to swap or purchase up to $6.5 billion of Delaware Life's related-party investments for assets classified as independent. The remediation plans targeted affiliated holdings of approximately 20% to 25% by year-end 2026 and less than 10% by June 30, 2027, subject to regulatory approval. An insurer and its affiliates do not spend billions of dollars correcting a condition that is immaterial.

60. These facts demonstrate how the Issuer Defendants' financial stability is directly tethered to Walter and his other companies.

**The Guggenheim Universe: One Interconnected Book Under Walter's Control**

61. An independent analysis titled, *The Guggenheim Universe*, compiled on August 23, 2026 by Independent researcher Nick Nemeth ("Nemeth"), writing in his Substack publication *Mispriced Assets*, confirms from the Issuer Defendants' own statutory filings that Walter controls both sides of the transactions at issue. Walter controls Guggenheim, whose GPIM unit manages money for the Issuer Defendants and is coded "U," for unaffiliated, in their filings. Walter also controls TWG Global Holdings, LLC, whose subsidiary TWG Financial Holdings owns 91.89% of Group 1001, and whose operating arms are the borrowers: the PDIF complex under TWG Lending & Debt, Bahia Energy under TWG Infrastructure, the Bradford Allen feeder under TWG Real Estate, and the Intrepid and Bedrock consumer-finance businesses. Group 1001 runs Delaware Life (approximately $64.7 billion in assets), Clear Spring (approximately $15.3 billion), and Gainbridge Life ("Gainbridge") (approximately $1.7 billion).

62. According to that analysis, Delaware Life's entire as-filed affiliated universe at year-end 2025 consisted of 17 rows totaling approximately $1.24 billion on a $64.7 billion balance sheet, before Delaware Life restated its affiliated bonds to approximately $13.3 billion and its total affiliated investments to approximately $18.25 billion. Clear Spring's as-filed affiliated rows

totaled approximately $511 million, while its restated total affiliated investments were approximately $5.89 billion, consisting of approximately $3.80 billion of restated bonds, $1.26 billion of affiliated short-term paper, $0.32 billion of Gainbridge common stock, and $0.51 billion of preferred, mortgage, and other investments.

63. The analysis further reports that Delaware Life's restated short-term bucket of approximately $3.24 billion corresponds almost exactly to the approximately $3.29 billion of short-term paper filed in the "unaffiliated" section of its Schedule DA. That section consists of 76 private limited liability companies issuing six-month notes at 6% to 9%, mostly placed by "direct funding." Clear Spring's restated short-term bucket of approximately $1.22 billion ties to its filed schedule to the dollar. Named Walter and Amistad entities, including Amistad STF I and Bradford Allen Term Investors, sit in the unaffiliated sections. Twenty-seven of the same invented-name borrowers appear on both insurers' books—approximately $1.05 billion at Delaware Life and $0.90 billion at Clear Spring, or $1.95 billion combined—with acquisition dates matching to the day.

64. The same analysis identifies 177 private-credit bond issuers on Delaware Life's Schedule D, totaling approximately $10.33 billion, that match the program's naming pattern, against a restated "contingent" bond bucket of approximately $12.62 billion. Many are named for Chicago streets—Monroe, Wacker, Clybourn, LaSalle, Hubbard, and Archer—while Guggenheim's offices are located at 227 West Monroe Street. Clear Spring's schedule shows 66 such issuers totaling approximately $2.36 billion, with vintages running back to 2018. None of the 261 candidate issuers appears on the approximately 780-entry organizational charts the insurers filed. The analysis cautions that membership of any single row is inferred, and that at least one large candidate may be a genuine third-party program.

65. The analysis also reports intra-group transactions bearing on Clear Spring's financial condition. On December 4, 2025, Clear Spring marked its stake in its affiliate Gainbridge at approximately $317.1 million, roughly ***five times*** the prior year's $63.0 million. On the same day, paper was transferred into Gainbridge from Clear Spring account codes. Gainbridge's filings contain no mention of the subpoenas or the investigation. Delaware Life and Clear Spring together held approximately $587 million of debt of American Media, the Dodgers' television network, coded "unaffiliated," and Clear Spring still carries the 2012 Dodgers-purchase vehicles GLAC GBM Investco and Paragon GBM Investco. The analysis calculates that Delaware Life's affiliate-contingent bonds equal approximately 3.1 times its total adjusted capital and Clear Spring's approximately 2.9 times. It also reports that $150 million of Delaware Life surplus notes held by a Sammons insurer were exchanged on January 27, 2026—weeks before the subpoenas—into a new self-rated instrument, and that a Delaware Life ordinary-annuity cession to Clear Spring opened on January 1, 2026.

66. The same individuals sit across the system. Towriss, CEO of Group 1001, was at December 31, 2012, the CRO, Chief Actuary, Secretary, and a Director of Heritage Life while also serving as CEO of Guggenheim Life, Clear Spring's predecessor. Dennis Cullen has served simultaneously as a director of Delaware Life, Delaware Life and Annuity Company, Clear Spring, and EquiTrust. Guggenheim's own fund disclosures state, "TWG Global, LLC holds an indirect, substantial economic interest in Guggenheim Capital, and thus is an indirect substantial owner of the Investment Manager. Further, TWG is controlled by a senior officer of Guggenheim Capital. Certain of TWG's subsidiaries are advisory clients of, and pay fees to, the Investment Manager." The analysis notes that no charges have been filed against anyone.

67. Upon information and belief, the Insurers' governance confirms the absence of independent oversight. Delaware Life's board consists of three retired company executives, one of whom also appears on Heritage Life's officer roster reprinted in the 2014 complaint. Group 1001's Chief Financial Officer ("CFO"), Linda Wang, simultaneously oversees the entire life and annuity business, information technology, information security, and internal audit. In the months between a whistleblower's complaints and the February 2026 subpoenas, rather than adding outside directors or independent counsel, Group 1001 promoted insiders, including its longtime company lawyer, its CFO, and Towriss's brother, Derek Towriss, a company actuary of roughly a decade, who in September 2025 was named president of the Gainbridge agency that markets annuities to first-time savers.

68. On July 26, 2026, Nemeth also wrote on *Mispriced Assets* that American Media is registered at the mailing address of Dodger Stadium and was formed by Guggenheim Baseball Management, the Walter-led group that bought the team. Its debt is the largest ***single holding at both Delaware Life and Clear Spring*** and is filed as a loan to an unaffiliated third party, alongside approximately $4 million of notes issued by Dodger Tickets LLC, also filed unaffiliated. Nemeth reported that GPIM has managed Delaware Life's money since 2014 and Clear Spring's since 2009, and that Delaware Life's investor presentation stated that the $16 billion had been "omitted from the Company's 2025 Annual Statement."

69. Nemeth further reported that the Insurers hold roughly 230 limited liability companies with invented names, all filed unaffiliated and none appearing on either Insurer's organizational chart. According to Delaware Division of Corporations records he cited, Verdemont Hills Financial, and Pinezanita Hills Financial were incorporated on the same day, July 3, 2024, and funded by the two Insurers four months later. Baumfree Corporate Finance was incorporated

on October 30, 2020, and funded seven days later, alongside Cinque Capital and Lilla SJ Capital, on the same day and at the same size. Each lists the same mass registered agent. Nemeth also reported that Delaware Life paid Egan-Jones $3.73 million in 2025, up from $2.1 million the prior year and under $1 million the year before, and that Egan-Jones is the only credit rater it pays.

70. Nemeth further reported that roughly $27 billion of affiliated or affiliate-linked paper sits across the two Insurers against approximately $5 billion of combined surplus, and that Delaware Life cedes risk to affiliated and offshore reinsurers, including a captive whose treaty, in the examiners' words, "does not transfer insurance risks." He reported that Towriss, who ran the Guggenheim insurer named in the 2014 policyholder complaint, runs Group 1001 today, and that Burnaby Collateral Holdings—a shell named in that complaint—remains on Delaware Life's books as an $8.9 million collateral loan carried at cost. In a later post, Nemeth reported that eight life insurers filing under four nominally separate owners hold one book of the same $40.6 billion of paper. Plaintiff pleads these reported facts on information and belief.

71. The following diagram demonstrates the sheer size and scope of Walter's business empire and the interconnectedness among Defendants, Unnamed Co-Conspirators, and others:




## The Insurers' Reliance on Egan-Jones

72. *The Los Angeles Times* and *Bloomberg* reported on August 20-21, 2026 that Walter's Insurers often relied on Egan-Jones, a minor ratings company, which supplied the only known ratings for more than one-fifth of their bond assets. At Clear Spring, at least 50% of its



4932-6138-4151

approximately $6.3 billion bond book was exclusively rated by Egan-Jones. The U.S. Department of Justice obtained records concerning Egan-Jones's work for Delaware Life and Clear Spring.

73. The *Financial Times* reported that Walter's Insurers paid millions of dollars to Egan-Jones. *The Wall Street Journal* reported on August 6, 2026 that Egan-Jones had rated approximately $40 billion of insurer debt, supplied scores for 37% of Delaware Life's private-letter-rated debt, and that Delaware Life and Clear Spring held nearly $300 million of American Media debt that ***neither*** marked as affiliated in 2025 filings.

74. *Bloomberg* reported on November 6, 2025, that SEC enforcement attorneys in its complex financial instruments unit were examining whether Egan-Jones and senior executives exerted improper commercial influence on ratings procedures. In Exchange Act Release No. 105067 (March 23, 2026), the SEC stated that Egan-Jones's application and other non-public information raised questions about whether its resources were adequate to consistently produce credit ratings with integrity, particularly in light of prior Section 15E examinations.

75. The SEC had previously revoked Egan-Jones's ABS and government registrations for material misstatements in 2013 (Release No. 68703), and a June 2022 settled order (Release No. 95127) found that Egan-Jones issued or maintained a rating while CEO Sean Egan was improperly influenced by sales or marketing considerations and imposed a $1.7 million penalty.

76. Upon information and belief, Egan-Jones ratings supported favorable NAIC designations and statutory capital treatment for affiliated or affiliate-dependent assets that lacked transparent market pricing. Egan-Jones is identified only as a potential Unnamed Co-Conspirator, not a named defendant; Plaintiff reserves the right to amend if discovery establishes their roles.

**Plaintiff's Annuity Transactions**

77. **The Delaware Life MYGA**. On October 13, 2023, Delaware Life issued Plaintiff, then age 72, a single premium deferred multi-year guaranteed annuity, Contract No. PPMY0016142, on form DLIC22-MYGA-FL-02. The contract type was IRA-Regular, funded with a single premium of $250,000. It carried a five-year initial guaranteed interest rate of 5.55% and a 1.00% minimum guaranteed interest rate, allowed a 10% free withdrawal beginning October 13, 2024, and imposed withdrawal and surrender charges and a Market Value Adjustment on withdrawals or surrenders before the end of the guaranteed interest rate period. Its maturity date is November 1, 2046. The contract included a 30-day right to examine and reserved Delaware Life's right to defer a surrender payment for up to six months.

78. **The Clear Spring Preserve Annuity**. Plaintiff's application for a Clear Spring Preserve Multi-Year Guaranteed Annuity, a modified single premium deferred annuity on form GLA-MYGA-FL-01, was electronically signed on October 16, 2023, which replaced another annuity. Clear Spring issued Contract No. 0200398657 to Plaintiff, then age 72, as owner and annuitant, with a Contract Date of November 2, 2023, funded by a $250,000 IRA premium. The contract provides a five-year guaranteed interest rate of 5.70% (with a 1.00% minimum guaranteed rate), surrender charges beginning at 7% in the first contract year, a five-year Market Value Adjustment period, a 10% free withdrawal amount beginning in contract year two, and a maturity date of November 2, 2051. The Clear Spring contract has not been surrendered and remains in force.

79. The Clear Spring contract states, "Clear Spring Life and Annuity Company, a stock Company, agrees to pay the proceeds of this contract." It provided a 30-day right to examine and allowed Clear Spring to defer payment of surrender value for 30 days. The agent certified that he

used only insurer-approved sales material. Plaintiff received the standardized materials representing that the contract's guarantees were backed by Clear Spring's financial strength and claims-paying ability. The product disclosure Clear Spring circulates to the producers who sell its Annuity contracts likewise states that guarantees are "subject to the financial strength and claims-paying ability of the issuing insurance company," and Clear Spring markets its products as designed for "principal protection."

80. **The Delaware Life TruePath Income Annuity**. On August 25, 2025, Delaware Life issued Plaintiff, then age 74, a TruePath Income fixed index annuity on form DLIC24-FIA-MSP-FL, Contract No. TP100035714, as a Roth IRA contract funded with an initial premium of $125,000. The contract imposes a ten-year surrender charge period, with withdrawal and surrender charges of 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, and 1% in contract years one through ten and 0% thereafter, a 10% free withdrawal percentage, and a Market Value Adjustment endorsement tied to Moody's Bond Indices—Corporate Average. It includes a Guaranteed Lifetime Withdrawal Benefit Rider with Plaintiff as the single covered person, effective August 25, 2025, with a 25% Guaranteed Lifetime Withdrawal Benefit ("GLWB") premium bonus rate and a 6.75% roll-up bonus rate. Its maturity date is September 1, 2051. The TruePath contract has not been surrendered and remains in force.

81. All in all, Plaintiff paid total premiums of $625,000—$375,000 to Delaware Life and $250,000 to Clear Spring. The contracts were standardized annuity forms delivered and solicited in Broward County, Florida. Plaintiff received standardized materials emphasizing the insurers' financial strength and claims-paying ability and, on information and belief, relied on those standardized materials in purchasing and retaining the Annuities.

82. On September 20, 2026, after the Issuer Defendants' June 26, 2026 disclosures, Plaintiff executed an ACORD 1035 Exchange/Rollover/Transfer form directing a full surrender and transfer of Delaware Life Contract No. PPMY0016142, an IRA annuity, to a Vanguard IRA brokerage account. Delaware Life's transaction confirmation reports a surrender value of $256,027.75 on September 25, 2026, from which Delaware Life deducted a surrender charge of $15,325.25 and a Market Value Adjustment charge of $1,277.10, totaling $16,602.35, assessed in the third guaranteed period year. The resulting disbursement amount was $239,425.40—less than the $250,000 single premium Plaintiff paid in 2023.

83. Plaintiff continues to hold Clear Spring Contract No. 0200398657 and Delaware Life Contract No. TP100035714, both of which remain in force. He cannot exit either contract without incurring surrender charges and Market Value Adjustments: the Clear Spring contract remains within its five-year surrender and Market Value Adjustment period, and the TruePath contract remains in the second year of its ten-year surrender charge period, in which a 9% charge applies.

84. Because of this mixed status, Plaintiff is a member of the Nationwide Class, the Florida Subclass, the Surrendered Subclass (defined below) (by virtue of his surrender of Delaware Life Contract No. PPMY0016142), and the Non-Surrendered Subclass (defined below) (by virtue of his continued ownership of Clear Spring Contract No. 0200398657 and Delaware Life Contract No. TP100035714).

85. The Issuer Defendants' approved materials represented that guarantees were backed by the issuing insurer's financial strength and claims-paying ability. Plaintiff alleges on information and belief that he received and relied on those standardized materials, which did not

disclose the true affiliated concentration, the February 2026 subpoenas, the control deficiencies, or the resulting risks to the insurers' ability to pay.

86. Had Plaintiff known the truth about the Issuer Defendants' asset concentrations and investigations, he would not have purchased or retained the Annuities. Had he learned the truth before the applicable right-to-examine periods expired, he would have returned the contracts for full refunds. The surrender schedules and Market Value Adjustments impaired his ability to exit without loss.

87. The concealment caused present economic injuries, including overpayment and loss of the benefit of the bargain, loss of the right to cancel without penalty, surrender charges and Market Value Adjustments, exposure to diminished contract value, and loss of informed retirement-planning opportunities. Class Members who replaced existing annuities also lost prior riders, benefits, or surrender-free positions.

88. The Issuer Defendants' contracts and sales materials represented that each insurer would pay contract proceeds according to the contract terms and that guarantees depended on its financial strength. Those representations were materially misleading because the insurers' general-account assets were substantially concentrated in affiliate-dependent investments and because the insurers continued selling while the classification was under federal scrutiny.

89. The Issuer Defendants' rating actions and remediation efforts confirm materiality. AM Best affirmed A- ratings but revised the outlook to negative; S&P revised Delaware Life's outlook to negative; Fitch placed Delaware Life on negative watch; Delaware Life and Clear Spring targeted substantial reductions in affiliated holdings; and financial institutions Truist and Fifth Third entirely paused sales of the Annuities after the disclosures. These events occurred after Plaintiff and Class Members committed retirement assets. On September 24, 2026, reporting citing

*Bloomberg* stated that Apollo CEO Marc Rowan criticized the Delaware Department of Insurance for allowing more than $20 billion of investments to be labeled unaffiliated.

90. The federal investigation and public disclosures did not reveal the full scope of the scheme. Defendants have not identified every loan and intermediary whose repayment depended on Walter-related parties. The complete extent of the misclassification, including earlier years and Clear Spring's pre-2025 figures, remains within Defendants' exclusive knowledge.

**Plaintiff's Reliance and the Injury He and the Class Sustained**

91. Plaintiff relied on the Issuer Defendants' standardized representations and omissions in paying or applying $625,000 in premiums. He reasonably believed that his retirement assets were supporting promises backed by diversified and financially sound insurers, rather than portfolios materially dependent on Walter-related affiliates.

92. After learning of the disclosures, Plaintiff elected to surrender Delaware Life Contract No. PPMY0016142 and directed the transfer to Vanguard. Delaware Life deducted a $15,325.25 surrender charge and a $1,277.10 Market Value Adjustment charge from the $256,027.75 surrender value, resulting in a disbursement of $239,425.40. Plaintiff seeks rescission, restitution, and damages without deduction of charges caused by Defendants' misconduct, as well as necessary and appropriate equitable relief.

93. Plaintiff is left with the same Catch-22 as other Class Members: remain exposed to insurers whose reported asset classifications had been materially corrected, or pay to exit. The surrender was not a voluntary change of investment strategy; it was undertaken only after disclosure of the concealed risk.

94. Plaintiff and Class Members suffered present, concrete, and quantifiable economic loss, including the following:

(a) **Overpayment/benefit of the bargain**. Plaintiff and Class Members paid for long-term unsecured promises represented to be backed by financially strong insurers with substantially independent assets. They instead received promises backed by portfolios materially concentrated in affiliate-dependent private credit.

(b) **Loss of the right to examine**. Defendants' concealment ran through applicable 30-day refund periods, eliminating a costless right to cancel and return premium.

(c) **Surrender charges and Market Value Adjustments**. Class Members who surrendered paid or incurred charges, and those who remain in force must pay charges to exit. Plaintiff's confirmed charges are a $15,325.25 surrender charge and a $1,277.10 Market Value Adjustment charge, totaling $16,602.35.

(d) **Replacement and retirement losses**. Class Members who exchanged existing annuities lost vested riders, death benefits, established income or withdrawal benefits, or surrender-free positions, while starting new surrender periods and exposure to Market Value Adjustments.

(e) **Diminution in contract value**. The restatements, rating actions, investigations, and distributor pauses impaired the value of the Annuities and the security of the promised benefits.

**Tolling, Fraudulent Concealment, and the Discovery Rule**

95. Any applicable limitations period is tolled by the discovery rule and Defendants' fraudulent concealment. Under Florida Statutes Section 95.031(2)(a), an action founded on fraud accrues when the facts constituting the fraud are discovered, not when Defendants successfully concealed them. Indiana Code Section 34-11-5-1 likewise permits an action after discovery when a liable person conceals the facts. Plaintiff and Class Members could not, with reasonable

diligence, discover the true concentration from filings that reported a small percentage and omitted the investigation. Defendants are estopped from asserting a limitations defense based on their concealment.

**CHOICE OF LAW**

96. Indiana common law governs the claims of the Nationwide Class. Delaware Life, Clear Spring, Group 1001 Insurance Holdings, LLC, and Group 1001, Inc. maintain their principal place of business at 10555 Group 1001 Way, Zionsville, Indiana, and the conduct giving rise to the claims emanated from Indiana. From there, Defendants prepared statutory statements, drafted and approved standardized contracts and sales materials, accepted applications, issued and administered Annuities, and decided to continue sales after the subpoenas.

97. Indiana has the most significant relationship to the Nationwide Class claims because the misrepresentations and omissions were conceived, prepared, and disseminated from Indiana and did not vary by purchaser residence. Indiana's insurance law supplies the standard of conduct for the Indiana-based enterprise, while the common law claims are pleaded uniformly across the Class.

98. Florida law applies to Plaintiff and the Florida Subclass. Plaintiff asserts Count VIII under Florida Statutes Sections 517.301 and 517.211 solely on behalf of himself and the Florida Subclass. Florida's Insurance Code, including Part IX of Chapter 626, §§626.9541(1)(a), (b), (e), and (l), 626.9641, 626.99, and 627.4554, supplies duties and standards of conduct as to that Subclass.

99. Alternatively, if another state's law governs a Class Member's claim, the common law of fraudulent concealment, fraud in the inducement, negligent misrepresentation, breach of contract and the implied covenant, aiding and abetting fraud, civil conspiracy, and unjust

enrichment does not vary in any respect material to the issues common here. Any variations can be managed through grouped instructions or additional state subclasses.

## CLASS ACTION ALLEGATIONS

100. The "Class Period" is between January 1, 2019 through June 26, 2026, inclusive. It begins with the first year in which Plaintiff is aware the Issuer Defendants' statutory statements reported affiliated investments at a small fraction of their true level and ends when the federal subpoenas and restated information were first disclosed. Plaintiff alleges on information and belief that the misclassification existed throughout the period, but likely began earlier; the precise extent is within Defendants' exclusive knowledge.

101. Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of himself and the following classes:

> All persons and entities who, during the Class Period, purchased or exchanged into an annuity issued by Delaware Life Insurance Company and/or Clear Spring Life and Annuity Company, including a multi-year guaranteed, fixed, fixed index, or variable annuity or associated rider or endorsement, and who received standardized contract, disclosure, illustration, or point-of-sale materials representing that the guarantees were backed by the issuing insurer's financial strength and claims-paying ability (the "Nationwide Class").[3]

102. Plaintiff also brings this action on behalf of the following subclass:

> All members of the Nationwide Class who purchased or exchanged into their annuity while residing in Florida, or whose annuity was issued for delivery in Florida (the "Florida Subclass").

103. Plaintiff further brings this action on behalf of the following subclass:

---

[3] For ease of reference, the Nationwide Class, Florida Subclass, Surrendered Subclass, and Non-Surrendered Subclass are referred to collectively as the "Class," and their members as "Class Members."

> All members of the Nationwide Class who fully surrendered, exchanged, or transferred out of one or more Annuities on or before the date this Complaint was filed (the "Surrendered Subclass").

104. Plaintiff further brings this action on behalf of the following subclass:

> All members of the Nationwide Class who continued to hold one or more Annuities in force as of the date this Complaint was filed (the "Non-Surrendered Subclass"). A person who surrendered one or more Annuities and continues to hold one or more other Annuities is a member of both the Surrendered Subclass and the Non-Surrendered Subclass, as to the respective Annuities.

105. Excluded from the Class are: (a) Defendants, their officers, directors, and employees; (b) any entity in which any Defendant has a controlling interest; (c) the affiliates, legal representatives, attorneys, heirs, and assigns of any Defendant; (d) members of the judiciary to whom this action is assigned and their immediate families; (e) persons who timely elect exclusion; and (f) persons who have previously released claims encompassed by this action.

**Numerosity**

106. Upon information and belief, the Nationwide Class includes tens of thousands of annuity purchasers. The Issuer Defendants report hundreds of thousands of active annuity and life policies, and the Florida Subclass, Surrendered Subclass, and Non-Surrendered Subclass each number in at least the hundreds. Joinder is impracticable, and the precise numbers are within Defendants' knowledge and can be determined through discovery.

**Ascertainability**

107. The Class is ascertainable by objective criteria in the Issuer Defendants' records, including the identity of the issuing insurer, product, date of issue and delivery, purchaser's state of residence, standardized forms delivered, surrender status, and charges assessed. No individualized merits inquiry is required to determine membership.

**Commonality**

108. There are questions of law and fact common to all Class Members that predominate over individual questions, including the following:

(a) whether Defendants sold or caused Class Members to purchase or exchange into Annuities issued by Delaware Life and/or Clear Spring based on representations about financial strength and claims-paying ability;

(b) whether the Issuer Defendants' statutory statements from at least 2019 through 2025 materially understated affiliated and related-party investments;

(c) whether Delaware Life's concentration reached approximately 39% to 42% and Clear Spring's reached approximately 49% to 59% while the reported figures remained small single-digit percentages;

(d) whether Defendants knowingly filed or caused false material statements concerning the Insurers' financial condition with insurance regulators;

(e) whether Defendants had superior and exclusive knowledge of the true concentration, the subpoenas, and the control deficiencies and concealed them from purchasers;

(f) whether Defendants owed duties to disclose the true concentration and investigation because they spoke about financial strength and claims-paying ability and were subject to insurance statutes;

(g) whether the concealed concentration and related-party conflicts rendered the Insurers' financial-strength, claims-paying-ability, and guaranteed-income representations materially misleading;

(h) whether the uniform representations and omissions violated Indiana common-law standards and, as to the Florida Subclass, Florida Statutes §§626.9541(1)(a), (b), (e), and (l), 626.9641, 626.99, and 627.4554;

(i) whether Defendants effected replacement or exchange transactions through misleading comparisons or omissions in violation of the standards reflected in Florida Statutes Section 626.9541(1)(l) and analogous law;

(j) whether Defendants continued soliciting and issuing Annuities after receiving the February 2026 subpoenas without disclosing them before right-to-examine periods expired;

(k) whether Walter, Guggenheim, TWG, Group 1001, and the other Non-Issuer Defendants had general awareness of the improper activity and provided substantial assistance;

(l) whether the Issuer Defendants and Non-Issuer Defendants agreed to misreport affiliated concentrations and committed overt acts in furtherance of a conspiracy;

(m) whether the Issuer Defendants breached the Annuity contracts or the implied covenant by concealing material information and enforcing surrender charges after disclosure;

(n) whether Defendants were unjustly enriched by retaining premiums, fees, surrender charges, Market Value Adjustments, and the use of policyholder assets;

(o) whether Annuities issued by the Insurers to Florida purchasers are securities or investment contracts under Chapter 517 and were sold through untrue statements or omissions in violation of Section 517.301;

(p) whether Class Members are entitled to rescission, return of premium without penalties, restitution, compensatory or punitive damages, and other relief;

(q) whether the concealed information was material to a reasonable annuity purchaser and whether reliance may be presumed or inferred from the standardized materials and uniform omissions;

(r) whether the Issuer Defendants' contracts and riders impose surrender charges and Market Value Adjustments that may not be enforced to defeat rescission or return of premium;

(s) whether Plaintiff and Class Members suffered damages from the concealed concentration, misleading guarantee representations, and charges incurred or required to exit; and

(t) whether declaratory, injunctive, rescissionary, return-of-premium, restitutionary, interest, fee, and other relief should be awarded to the Class.

109. The common questions predominate because the core liability issues can be resolved from standardized forms, statutory filings, regulatory disclosures, and common proof concerning the Issuer Defendants' portfolios and Defendants' coordinated conduct.

110. Individual differences in premium, product, surrender status, or deductions concern remedies and do not defeat common liability questions or class treatment.

**Typicality**

111. Plaintiff's claims are typical of the Class's claims. He purchased Annuities issued by both Delaware Life and Clear Spring during the Class Period using standardized materials representing that guarantees were backed by the issuing insurer's financial strength and claims-paying ability. He surrendered one Annuity after the disclosures, incurring charges typical of the Surrendered Subclass, and continues to hold two Annuities subject to the same surrender charges and risks faced by the Non-Surrendered Subclass.

**Adequacy of Representation**

112. Plaintiff will fairly and adequately protect the interests of Class Members. His interests are aligned with the Class and he has no conflicts. He has retained counsel experienced in class action, insurance, securities, consumer, and complex litigation.

**Predominance**

113. Common questions of law and fact predominate over any questions affecting only individual Class Members. The central issues in this case are common to all Class Members and can be resolved on a Class-wide basis. They include whether Defendants marketed Annuities issued by Delaware Life and Clear Spring based on financial-strength and claims-paying-ability representations; whether the true related-party concentration—approximately 39% to 42% at Delaware Life and approximately 49% to 59% at Clear Spring—was concealed; whether that omission made the guarantees misleading; whether the Annuity sales and the related misrepresentations and omissions violated the standards of conduct established by the Indiana Insurance Code and, as to the Florida Subclass, Florida's Insurance Code, including Part IX of Chapter 626; whether the Issuer Defendants breached applicable contracts and riders; and whether Class Members are entitled to rescission and return of premium without surrender charges.

114. The Annuity-sale transactions and the misrepresentations and omissions were common across the Class. Defendants used standardized annuity applications, disclosure statements, specifications pages, illustrations, contracts, and marketing materials, prepared at the Issuer Defendants' shared Zionsville, Indiana headquarters, to present guaranteed rates, lifetime-income benefits, and insurer-backed guarantees while omitting the true related-party concentration. The concealed concentration is itself subject to common proof: the same invented-name private-credit borrowers appear on both Delaware Life's and Clear Spring's schedules,

acquired on the same days, under the same manager. Whether those materials and conduct violated the standards of conduct established by the Indiana Insurance Code and, as to the Florida Subclass, Section 626.9541 of Florida's Insurance Code, whether Defendants are liable under Indiana common law, and whether Class Members are entitled to rescission, return of premium, or damages can therefore be determined on a Class-wide basis, subject to any individualized remedies issues.

115. The application of a single body of law to the Nationwide Class is appropriate and does not defeat predominance. For the reasons alleged above, Indiana common law governs the claims of the Nationwide Class, and Florida statutory law applies only to the claims of the Florida Subclass. In the alternative, any variation in the governing law can be managed through grouped jury instructions or state subclasses. In any event, the claims of the Surrendered Subclass and the Non-Surrendered Subclass turn on a single course of conduct, identical for every Subclass member: Defendants' concealment of the Issuer Defendants' affiliated concentration while selling, administering, and enforcing exit charges on the Annuities. Membership in either Subclass is determined contract by contract from the Issuer Defendants' records, including, for purchasers who surrendered one Annuity and continue to hold another, membership in both. Surrender status affects only the form of relief—restitution of charges already paid versus rescission without charges—not liability. Plaintiff's surrender of Delaware Life Contract No. PPMY0016142 and his continued ownership of Clear Spring Contract No. 0200398657 and Delaware Life Contract No. TP100035714 present both remedies on a common record.

**Superiority**

116. A class action is superior to other available methods. Separate actions would create a risk of inconsistent adjudications and impose individual burdens disproportionate to the common

relief sought. Class treatment provides economy, uniformity, and efficient supervision by one court.

117. This action is also maintainable under Fed. R. Civ. P. 23(b)(2) because Defendants acted on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate, including a declaration that surrender charges and Market Value Adjustments may not be enforced against Class Members who elect to rescind contracts procured by concealment.

## CAUSES OF ACTION

### COUNT I
### Fraudulent Concealment and Nondisclosure in the Solicitation, Sale, and Replacement of Insurance
### (On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)

118. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

119. Plaintiff brings this Count under Indiana common law on behalf of himself and the Nationwide Class, including the Florida Subclass, the Surrendered Subclass, and the Non-Surrendered Subclass. The allegations of this Count concerning the Florida Insurance Code are made on behalf of Plaintiff and the Florida Subclass only. To the extent Indiana law does not apply to Count II, it is asserted under Florida law on behalf of the Florida Subclass.

120. The Annuities are an "annuity contract" and an "insurance policy" or insurance product within the meaning and regulatory scope of Florida's Insurance Code and the insurance codes of the other states in which they were sold. That includes Plaintiff's Delaware Life single premium deferred multi-year guaranteed annuity (Contract No. PPMY0016142), his Delaware Life TruePath Income fixed index annuity with its GLWB rider (Contract No. TP100035714), his Clear Spring Preserve modified single premium deferred annuity (Contract No. 0200398657), and the materially similar Annuities and riders offered or sold to Class Members. The Annuities are

subject to Florida's insurance regulatory framework, including oversight by the FOIR and the DFS, and to applicable insurer and insurance-agent licensing requirements.

121. Delaware Life and Clear Spring are each an "insurer" within the meaning and regulatory scope of Florida's Insurance Code. Walter, Group 1001, TWG, and Guggenheim participated in, directed, approved, or materially aided the conduct and transactions alleged herein, as described above and below.

122. Under Indiana law, which governs this Count as to the Nationwide Class, the standard of conduct for Defendants' concealment is supplied by the Indiana Insurance Code's prohibition of unfair and deceptive acts and practices in the business of insurance, Indiana Code Section 27-4-1-4. That statute governs the conduct of the Zionsville, Indiana headquarters from which Delaware Life and Clear Spring prepared their statutory statements and drafted, approved, and disseminated the standardized sales materials at issue. Section 27-4-1-4(a) defines as unfair and deceptive, among other things: misrepresenting the terms of any policy or the benefits or advantages it promises; making any misleading representation or misrepresentation as to the financial condition of any insurer or the legal reserve system upon which any life insurer operates; making any misrepresentation to a policyholder for the purpose of inducing the policyholder to lapse, forfeit, or surrender existing insurance; placing before the public any untrue, deceptive, or misleading statement with respect to the conduct of an insurance business; and, with intent to deceive, filing with a public official any false statement of an insurer's financial condition, or making false entries in, or omitting true entries of material fact from, an insurer's books, reports, or statements. Ind. Code §27-4-1-4(a)(1)(A), (a)(1)(C), (a)(1)(E), (a)(2), (a)(5). Plaintiff does not contend that Section 27-4-1-4 creates a private right of action; it establishes the standard of conduct against which Defendants' common-law duties are measured. The unfair-insurance-trade-practices

statutes of the other states in which Class Members purchased their Annuities prohibit the same conduct in materially identical terms.

123. As to Plaintiff and the Florida Subclass, Florida's Insurance Code independently supplies the same standard of conduct. Part IX of Chapter 626, Florida Statutes (§§626.951–626.99) is the "Unfair Insurance Trade Practices" part. Section 626.951(1) declares its purpose "to regulate trade practices relating to the business of insurance" by defining, or providing for the determination of, practices in Florida that constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

124. Section 626.9521 prohibits any person from engaging in this state in any trade practice that is defined in Part IX, or determined pursuant to Section 626.951 or Section 626.9561, to be an unfair method of competition or an unfair or deceptive act or practice involving the business of insurance.

125. Section 626.9531, concerning identification of insurers, agents, and insurance contracts, forms part of that regulatory framework. Defendants' applications, disclosures, specifications pages, contracts, and sales materials identified Delaware Life and Clear Spring, the agents, and the Annuities, but the conduct alleged herein undermined the accurate insurance disclosures required by that framework.

126. Section 626.9641, the Policyholders' Bill of Rights, recognizes that policyholders are entitled to insurance advertising and other selling approaches that provide accurate and balanced information on the benefits and limitations of a policy, and to an insurance company that is financially stable. Defendants' conduct deprived Plaintiff and Class Members of those protections in connection with their Annuity transactions.

127. Section 626.9541(1)(a), entitled, "Misrepresentations and false advertising of insurance policies," defines as an unfair or deceptive act knowingly making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, illustration, circular, statement, sales presentation, omission, comparison, or property and casualty certificate of insurance altered after being issued, which: (1) "[m]isrepresents the benefits, advantages, conditions, or terms of any insurance policy"; (4) "[i]s misleading, or is a misrepresentation, as to the financial condition of any person or as to the legal reserve system upon which any life insurer operates"; or (6) "[i]s a misrepresentation for the purpose of inducing, or tending to induce, the lapse, forfeiture, exchange, conversion, or surrender of any insurance policy."

128. Section 626.9541(1)(b), entitled, "False information and advertising generally," defines as an unfair or deceptive act knowingly making, publishing, disseminating, circulating, or placing before the public, or causing to be so placed, in any form or by any means, "an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance, which is untrue, deceptive, or misleading."

129. Section 626.9541(1)(e), entitled, "False statements and entries," defines as an unfair or deceptive act knowingly filing with any supervisory or other public official, or making, publishing, disseminating, circulating, delivering to any person, or placing before the public, "any false material statement," and "[k]nowingly making any false entry of a material fact in any book, report, or statement of any person, or knowingly omitting to make a true entry of any material fact pertaining to the business of such person in any book, report, or statement of such person." This provision addresses the conduct at the heart of this action. Delaware Life reported to insurance regulators that its related-party investments were approximately 3% of invested assets, or approximately $1.4 billion. That statement was false and material. Delaware Life's own

restatement, made only after federal grand jury subpoenas compelled an internal investigation, put the figure at approximately $16.37 billion at December 31, 2025, and at approximately 42% of invested assets in the reclassified audited 2025 financial statements. Clear Spring's 2025 Annual Statement listed only approximately $3.7 million of affiliated bonds on General Interrogatory 13.2, against restated affiliated bonds of approximately $3.8 billion and total restated affiliated assets of $5.895 billion, or 59% of general-account invested assets. Clear Spring has admitted that the restated amounts were omitted from its 2025 Annual Statement. These false regulatory statements were not collateral to the sale; they were the foundation of the financial-strength representation that Defendants placed at the center of every point-of-sale document delivered to Plaintiff and the Class.

130. Section 626.9541(1)(l), entitled, "Twisting," defines as an unfair or deceptive act "[k]nowingly making any misleading representations or incomplete or fraudulent comparisons or fraudulent material omissions of or with respect to any insurance policies or insurers for the purpose of inducing, or tending to induce, any person to lapse, forfeit, surrender, terminate, retain, pledge, assign, borrow on, or convert any insurance policy or to take out a policy of insurance in another insurer." Plaintiff's Clear Spring application, electronically signed on October 16, 2023, was marked as a replacement of an existing annuity. That application was taken by the same agent, Armando Blondin ("Blondin"), through whom Delaware Life had issued Plaintiff's Contract No. PPMY0016142 three days earlier. The replacement and comparison materials were materially incomplete because they weighed the products against one another while omitting the fact that most bore on the value of the Clear Spring and Delaware Life guarantees: the Insurers standing behind them had misreported their related-party concentration by an order of magnitude.

131. Defendants' conduct falls within Indiana Code Section 27-4-1-4(a)(1)(A), (a)(1)(C), (a)(1)(E), (a)(2), and (a)(5), within the parallel provisions of other states' statutes, and, as to the Florida Subclass, within Section 626.9541(1)(a)1, (1)(a)4, (1)(a)6, (1)(b), (1)(e), and (1)(l). The guaranteed-rate, guaranteed-income, and financial-strength representations misrepresented the benefits and terms of the Annuities. Defendants concealed Delaware Life's related-party concentration of approximately 39% to 42% (at least approximately $16.37 billion) and Clear Spring's of approximately 49% to 59% (approximately $5.9 billion, or roughly five times its capital and surplus), against the small single-digit percentages previously reported. That concealment was misleading and a misrepresentation as to the Issuer Defendants' financial condition and the legal reserve system upon which they operate, bearing directly on their financial strength and claims-paying ability. In reliance on those representations, Plaintiff committed $625,000 of retirement savings to the Issuer Defendants and, through the Clear Spring replacement, accepted a new five-year surrender period beginning at 7%, plus exposure to a Market Value Adjustment.

132. As to the Florida Subclass, Section 626.9631 provides that the provisions of Part IX are cumulative to rights under the general civil and common law, and that no action of the department, commission, or office shall abrogate those rights to damages or other relief in any court. Plaintiff does not assert that Section 626.9541(1)(a) creates a freestanding private right of action. Rather, Defendants' Insurance Code violations establish the wrongful conduct and standard of conduct underlying the common-law claims of Plaintiff and the Florida Subclass, and support the damages, rescission, return-of-premium, and other relief preserved and remediable through Section 626.9631 and the common law.

133. Defendants owed Plaintiff and Class Members a duty to disclose the true related-party concentration and the pendency of the federal grand jury subpoenas. That duty arose independently from three sources. First, Defendants had superior and, as a practical matter, exclusive knowledge of the Issuer Defendants' true financial condition. Neither Delaware Life nor Clear Spring is a public reporting company, and their condition was knowable to consumers only through the statutory filings Defendants themselves rendered false. Second, having elected to speak about the Issuer Defendants' financial strength and claims-paying ability, and having made that subject the express foundation of every guarantee they sold, Defendants assumed a duty to speak fully and truthfully about it and could not tell a half-truth that created a materially false impression. Third, the Indiana Insurance Code, the insurance codes of the other states in which the Annuities were sold, and, as to the Florida Subclass, the Florida Insurance Code impose affirmative disclosure obligations on insurers in the sale and replacement of annuities. Those obligations arise under Indiana Code Section 27-4-1-4 and, as to the Florida Subclass, Florida Statutes Sections 626.9541(1)(a)-(b), (e), and (l), 626.9641, 626.99, and 627.4554, and under the replacement and comparison forms Defendants themselves delivered. In addition, Delaware's Insurance Holding Company System Registration statute, 18 Del. C. ch. 50, and NAIC statutory accounting principles required Delaware Life and Clear Spring to report their affiliated investments truthfully in the statutory statements on which every financial-strength rating and representation depended. Section 5005(a)(1)(e) requires that "[t]he books, accounts and records of each party to all such transactions shall be so maintained as to clearly and accurately disclose the nature and details of the transactions."

134. Defendants made statements and omissions concerning the Annuities' guaranteed rates and income, the financial strength of the issuing insurer, and its claims-paying ability. Those

statements and omissions were false or misleading when made. Defendants materially understated the related-party concentration as a small single-digit percentage while the true concentration was approximately 39% to 42% at Delaware Life, or at least approximately $16.37 billion, and approximately 49% to 59% at Clear Spring, or approximately $5.9 billion. The concealed concentration bore directly on the Issuer Defendants' financial strength and ability to pay claims.

135. The guaranteed-rate, guaranteed-income, financial-strength, and claims-paying-ability representations and omissions were material to a reasonable purchaser of an annuity. Defendants knew or should have known that those representations and omissions were false and misleading because of their superior knowledge of the Issuer Defendants' assets, related-party relationships, reserves, and ability to perform their guarantees. As to the period on and after February 2026, Defendants had actual knowledge: they had been served with federal grand jury subpoenas directed at the very classification they were representing. They concealed both the subpoenas and the underlying misclassification while continuing to sell Annuities and to administer, and collect exit charges on, existing contracts, including Plaintiff's.

136. Plaintiff and Class Members relied on, and were induced by, Defendants' representations and omissions to purchase or exchange into the Annuities, to pay or apply premiums, and to retain the Annuities. Plaintiff paid a $250,000 single premium to Delaware Life for Contract No. PPMY0016142 and a $250,000 premium to Clear Spring for Contract No. 0200398657, which replaced an existing annuity. He also applied a $125,000 Roth IRA premium to Delaware Life for Contract No. TP100035714. Because the omissions at issue were uniform, material, and made by parties with a duty to disclose, reliance may be presumed on a Class-wide basis.

137. As a direct and proximate result, Plaintiff and Class Members were damaged. Their damages include premiums paid or applied; surrender charges and Market Value Adjustment charges actually paid or, for Class Members still holding their contracts, presently owed (charges already incurred); other withdrawal restrictions; loss of the benefit of their bargain; loss of the unconditional right to return the contract for a full refund of premium; and loss of the opportunity to make informed annuity decisions. Plaintiff's surrender of Contract No. PPMY0016142 yielded a disbursement of $239,425.40, after deduction of a $15,325.25 surrender charge and a $1,277.10 Market Value Adjustment charge, against the $250,000 premium he paid. His Clear Spring and TruePath contracts remain in force and subject to surrender charges and Market Value Adjustments if he exits.

138. Plaintiff and Class Members are entitled to rescission and return of the premium paid or applied, without deduction (or repayment) of surrender charges, Market Value Adjustments, or other penalties, including as to Plaintiff's Clear Spring Contract No. 0200398657 and Delaware Life Contract No. TP100035714. Class Members who have already surrendered, including Plaintiff as to Delaware Life Contract No. PPMY0016142, are entitled to restitution of the surrender charges, Market Value Adjustments, and other amounts deducted on surrender.

139. Plaintiff and Class Members further seek compensatory damages and, for Defendants' knowing and willful conduct, punitive damages, together with pre- and post-judgment interest and reasonable attorneys' fees and costs to the extent available by law. Plaintiff does not rely on Florida Statutes Section 624.155 as a civil remedy for the Insurance Code violations alleged in this Count and does not assert that Section 624.155 creates a private right of action for Section 626.9541(1)(a).

140. As a direct and proximate result of Defendants' fraudulent concealment and nondisclosure, Plaintiff and the Class have been damaged and are entitled to rescission and return of premium without surrender charges, compensatory and punitive damages, interest, and reasonable attorneys' fees and costs, together with such other relief as this Court deems just and proper.

**COUNT II**
**Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing (On Behalf of Plaintiff and the Nationwide Class, Against the Issuer Defendants)**

141. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

142. To the extent Indiana law does not apply to Count II, it is asserted under Florida law on behalf of the Florida Subclass.

143. Plaintiff and Class Members entered into binding annuity contracts with Delaware Life and/or Clear Spring in connection with their purchases or exchanges. Plaintiff's contracts are Delaware Life Contract No. PPMY0016142, Delaware Life Contract No. TP100035714 and its GLWB rider, and Clear Spring Contract No. 0200398657, under which "Clear Spring Life and Annuity Company, a stock Company, agrees to pay the proceeds of this contract."

144. Plaintiff's Annuity contracts and riders set forth the Issuer Defendants' obligations. The Delaware Life MYGA guaranteed a 5.55% interest rate for a five-year initial period and a 1.00% minimum rate. The Clear Spring Preserve contract guaranteed a 5.70% rate for a five-year period and a 1.00% minimum rate. The TruePath contract and GLWB rider provided a 25% GLWB premium bonus and a 6.75% roll-up bonus rate for Plaintiff as covered person. The contracts and riders also specified the applicable withdrawal and surrender-charge terms and Market Value Adjustments. The disclosure materials represented that the guarantees were backed by the issuing

insurer's financial strength and claims-paying ability. Plaintiff pleads these writings together or, in the alternative, as separate contractual and tort representations as permitted by law.

145. The Annuity contracts and riders issued by Delaware Life and Clear Spring to Class Members set forth the same obligations owed to Plaintiff, and made the same representations that guarantees were backed by the issuing insurer's financial strength and claims-paying ability.

146. Under Indiana law, which governs this Count as to the Nationwide Class, there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured, and that duty includes the obligation to refrain from deceiving the insured. The Annuities are insurance contracts issued by life insurers. The implied covenant of good faith and fair dealing they carry bars Delaware Life and Clear Spring from acting in a manner that destroys or injures Class Members' right to receive the fruits of their contracts, and it governs the exercise of any discretion the contracts confer. The Issuer Defendants breached that covenant by: (a) issuing and administering contracts whose central promise was expressly conditioned on their own financial strength while knowingly misreporting the composition of the assets supporting that strength; (b) allowing contractual and statutory unconditional refund periods to expire without disclosing the true affiliated concentration and, for purchases on and after February 2026, the federal grand jury subpoenas; and (c) invoking, or reserving the right to invoke, the withdrawal and surrender charge schedules and Market Value Adjustments to penalize Class Members who seek to exit contracts procured by that concealment.

147. The Issuer Defendants breached by issuing and administering Plaintiff's and Class Members' Annuities while concealing the material concentration that directly affected the financial-strength and claims-paying-ability basis of the promised guarantees, and by failing to honor the guaranteed-rate, guaranteed-income, and GLWB obligations as represented.

148. The contracts' surrender-charge schedules, together with the Market Value Adjustments, impede and impeded Plaintiff's and Class Members' ability to unwind the transactions. Those schedules include Clear Spring's charges beginning at 7% in the first contract year, the TruePath contract's ten-year schedule beginning at 10%, and the Delaware Life MYGA's withdrawal and surrender charges during its guaranteed period. If the Issuer Defendants contend that these charges apply to rescission or return of premium after their material breach and concealment, that position further breaches the contracts and the implied covenant. In any event, Plaintiff seeks return of the premium without those charges, or return of both the premium and the surrender charges.

149. Plaintiff and Class Members have performed all conditions, covenants, and obligations required of them under the applicable Annuity contracts and riders, or such performance has been excused by the Issuer Defendants' material breach.

150. Delaware Life further breached the implied covenant when, after the June 26, 2026 disclosures, it applied its penalty provisions to Plaintiff's surrender of Contract No. PPMY0016142, a contract it had obtained by concealment. Delaware Life deducted a $15,325.25 surrender charge and a $1,277.10 Market Value Adjustment charge, leaving a disbursement of $239,425.40, against the $250,000 premium Plaintiff paid. Delaware Life and Clear Spring reserve the same position as to Plaintiff's in-force contracts and every Class Member. A party may not procure a contract by concealing material facts it is bound to disclose and then invoke that contract's exit charges to profit from the victim's discovery of the truth.

151. As a direct and proximate result of the Issuer Defendants' breach of the applicable Annuity contracts and riders and of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered damages. Those damages include, but are not limited to, the loss

of the benefit of their bargain, the premium paid or applied, the withdrawal and surrender charges and Market Value Adjustment charges the Issuer Defendants assessed on exit or that Class Members must pay in order to exit, diminution in the value and recoverability of their annuities, and other damages to be proven.

**COUNT III**
**Fraud in the Inducement/Fraudulent Misrepresentation (On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

152. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

153. To the extent Indiana law does not apply to Count III, it is asserted under Florida law on behalf of the Florida Subclass.

154. Defendants made material representations of fact to Plaintiff in connection with the solicitation and sale of his three Annuities, each an insurance product and annuity contract, and, upon information and belief, made materially similar representations to Class Members. Through the October 2023 application, specifications pages, and contract delivered by agent Blondin, Defendants represented that Delaware Life Contract No. PPMY0016142 would credit a guaranteed 5.55% rate for five years. Through the application electronically signed October 16, 2023 and the contract issued November 2, 2023, Defendants represented that Clear Spring Contract No. 0200398657 would credit a guaranteed 5.70% rate for five years. Through the application, specifications pages, and contract issued on August 25, 2025 through agent Andrew M. Costa, Defendants represented that Delaware Life Contract No. TP100035714 would provide a GLWB with a 25% premium bonus and a 6.75% roll-up bonus rate. The materials also disclosed the surrender schedules and Market Value Adjustments, and represented that all guarantees were backed by the issuing insurer's financial strength and claims-paying ability.

155. These representations were made or repeated by Defendants through their officers, agents, and approved sales materials, including the Issuer Defendants' applications, specifications pages, and disclosure materials, and the materials used and relied on by Plaintiff at or before each application and through issuance and delivery of each Annuity. The agents certified that they used only insurer-approved sales materials.

156. Defendants' representations were materially misleading when made because they conveyed that the Issuer Defendants' financial strength supported the guarantees while omitting the true allocation of assets to Walter-related entities. Upon information and belief, when Defendants represented the Annuities' guarantees and claims-paying-ability backing, they knew or recklessly disregarded that the related-party concentration was approximately 40% at Delaware Life and more than 50% at Clear Spring, while small single-digit figures had been reported or represented to regulators and the public.

157. Delaware Life and Clear Spring received federal grand jury subpoenas in February 2026 directed at whether private-credit investments introduced by an affiliate should have been treated as related-party transactions. From that point, Defendants knew that the classification underlying their financial-strength representations was under federal criminal scrutiny. They continued to sell, continued to administer Plaintiff's and Class Members' contracts, and said nothing until June 26, 2026. Upon information and belief, on January 27, 2026, weeks before the subpoenas, $150 million of Delaware Life surplus notes held by a Sammons insurer were exchanged into a new self-rated instrument.

158. Scienter is further supported by several facts: (a) the magnitude of the discrepancy: Delaware Life reported approximately 3% against approximately 42% restated, a difference exceeding $15 billion, and Clear Spring reported approximately $3.7 million of affiliated bonds

against approximately $3.8 billion restated, with total affiliated assets roughly five times its capital and surplus; (b) the structural character of the misclassification, which required interposing nominally unaffiliated intermediaries between the insurers and the ultimate economic exposure, including 27 invented-name borrowers placed on both insurers' books on the same days; (c) upon information and belief, the batch formation of shell borrowers shortly before they were funded; (d) Walter's control of both the insurers and the entities on the other side of the transactions; (e) the 2014 policyholder lawsuit, which put Walter and his insurers on notice of the same conduct more than a decade earlier; Towriss ran the Guggenheim insurer named in that suit and runs Group 1001 today; and (f) the placement of former Guggenheim private-credit personnel in the insurers' investment function.

159. Defendants made and repeated these representations and omissions with the intent to induce Plaintiff and Class Members to purchase or exchange into Delaware Life and Clear Spring annuities, to tender their premiums, and to retain the contracts. Defendants knew that the represented guaranteed rates, lifetime-income benefits, and financial-strength-backed guarantees were material to decisions whether to replace an existing annuity and commit retirement assets to the Issuer Defendants.

160. Plaintiff relied on Defendants' representations and omissions in purchasing Delaware Life Contract No. PPMY0016142, in replacing an existing annuity with Clear Spring Contract No. 0200398657, and in purchasing Delaware Life Contract No. TP100035714, applying $625,000 of IRA and Roth IRA retirement savings in total. Had Plaintiff known the true related-party concentration and its bearing on the Issuer Defendants' guarantees, he would not have proceeded with those transactions. His reliance was reasonable. Neither Delaware Life nor Clear Spring is a public reporting company, and the only public information about their financial

condition derives from the statutory filings Defendants rendered false and the ratings built upon them. The law of every state presumes this asymmetry, which is why it obligates insurers to disclose, and Defendants directed Plaintiff's attention to the insurer's financial strength as the foundation of every guarantee they sold.

161. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiff and Class Members have suffered damages. Those damages include, but are not limited to, the premium paid or applied; the Annuities' withdrawal and surrender charges and Market Value Adjustments actually paid or presently owed; the forfeiture, upon surrender, of the guaranteed rates and lifetime income for which they paid; loss of the benefit of their bargain; loss of alternative retirement-income opportunities; loss of the unconditional right to return the contract for a full refund; and the risk of losing benefits associated with an existing annuity exchanged or replaced in reliance on Defendants' inducements.

162. Defendants' conduct was willful, wanton, and undertaken with conscious disregard for the rights of Plaintiff and Class Members. Defendants' fraudulent scheme was designed to enrich Walter and his related entities by concentrating the insurers' assets supporting annuity guarantees in Walter-related entities while purchasers were told that Delaware Life's and Clear Spring's financial strength and claims-paying ability backed their guarantees. Plaintiff and Class Members are therefore entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

**COUNT IV**
**Negligent Misrepresentation (In the Alternative, On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

163. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

164. In the alternative to Count III, and to the extent Defendants' misrepresentations were not made knowingly or with intent to deceive, Defendants negligently misrepresented several matters: the Annuities' guaranteed rates, income, and rider benefits; Delaware Life's and Clear Spring's financial strength and claims-paying ability; and the related-party concentration. Defendants also negligently omitted the true concentration from the information supplied to Plaintiff and Class Members.

165. To the extent Indiana law does not apply to Count IV, it is asserted under Florida law on behalf of the Florida Subclass.

166. Defendants owed a duty of care to Plaintiff and Class Members to provide accurate information regarding the Annuities' benefits, fees, withdrawal restrictions, financial-strength and claims-paying-ability backing, and related-party concentration. This duty arose from the parties' contractual relationship, Defendants' superior knowledge of the insurers' portfolios and guarantees, and the trust and confidence that purchasers placed in Defendants as insurers, asset managers, and professional financial participants. The duty is independently imposed by the Indiana Insurance Code, including Indiana Code Section 27-4-1-4; by the materially identical insurance codes of the other states in which the Annuities were sold; and, as to the Florida Subclass, by the Florida Insurance Code, including Sections 626.9541(1)(a)-(b), (e), and (l), 626.9641, and 627.4554. Those statutes establish the standard of conduct governing an insurer's communications with annuity purchasers and exist for the protection of the class of persons to which Plaintiff belongs.

167. Defendants breached their duty of care by supplying or approving information that emphasized guaranteed rates, principal protection, lifetime income, and financial-strength-backed guarantees while failing to disclose the related-party concentration of approximately 39% to 42%

at Delaware Life and approximately 49% to 59% at Clear Spring, and failing to disclose that only small single-digit figures had been reported to regulators and the public. Defendants failed to exercise reasonable care in ascertaining or communicating the true concentration and its significance to the ability to pay claims.

168. Defendants supplied materially similar information to Plaintiff and Class Members for the guidance of their annuity purchase and exchange decisions. Defendants knew, or should have known, that purchasers would rely on representations concerning guaranteed rates and income and the insurer's financial strength and claims-paying ability in deciding whether to commit premiums and replace existing annuities.

169. Plaintiff and Class Members reasonably relied on Defendants' representations and omissions. Such reliance was reasonable given Defendants' position as insurers and professional asset managers, their superior access to information regarding the true related-party concentration and claims-paying ability, and the fact that purchasers had no independent means of verifying the insurers' portfolio allocations when making their annuity decisions.

170. As a direct and proximate result of Defendants' negligent misrepresentations and omissions, Plaintiff and Class Members have suffered damages. Those damages include, but are not limited to, the premium paid or applied, exposure to the Annuities' withdrawal and surrender charges and Market Value Adjustments, loss of alternative retirement-income opportunities, loss of the benefit of the bargain, and other damages to be proven.

## COUNT V
## Aiding and Abetting Fraud
## (On Behalf of Plaintiff and the Nationwide Class, Against the Non-Issuer Defendants)

171. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

172. This Count is asserted against the Non-Issuer Defendants. Delaware Life and Clear Spring are the primary wrongdoers whose fraud the Non-Issuer Defendants aided and abetted.

173. To the extent Indiana law does not apply to Count V, it is asserted under Florida law on behalf of the Florida Subclass.

174. An underlying fraud occurred. The Issuer Defendants misrepresented financial condition to regulators and purchasers, concealed the true concentration and subpoenas, and induced Plaintiff and Class Members to purchase or exchange into the Annuities and tender premiums.

175. Each Non-Issuer Defendant knew of the fraud or had general awareness that its role was part of an overall improper activity. Walter controlled the insurers and businesses receiving the financing; TWG and Group 1001 controlled the insurers; and Guggenheim and GPIM managed, introduced, or valued the investments.

176. Walter sat on both sides of the transactions and had been placed on notice by the 2014 policyholder lawsuit. TWG undertook remediation and issued public statements concerning the insurers. Group 1001 owned and directed the Issuer Defendants and controlled the standardized materials and filings.

177. Guggenheim and GPIM originated, introduced, structured, managed, or valued the private-credit investments. GPIM managed Clear Spring investments under an Investment Management Agreement effective December 17, 2009, which the Delaware Department of Insurance's 2023 examination report identifies as a related-party agreement.

178. KPMG audited Delaware Life and Clear Spring, issued clean opinions, and issued unqualified opinions on restated statements despite warning about GPI revenue recognition. Egan-

Jones supplied ratings used for insurer assets. KPMG and Egan-Jones are potential Unnamed Co-Conspirators only and are not named as defendants.

179. The Non-Issuer Defendants rendered substantial assistance by designing, funding, directing, or executing structures that interposed nominally unaffiliated intermediaries, causing assets to be reported as unaffiliated, approving standardized sales materials, obtaining Egan-Jones ratings, issuing clean audit opinions, and continuing sales after the subpoenas.

180. The assistance proximately caused Plaintiff's and Class Members' injuries because the financial-strength representations were false only because of the structures, classifications, ratings, and omissions the Non-Issuer Defendants designed, approved, or facilitated.

181. Plaintiff and Class Members are entitled to compensatory damages, restitution, and punitive damages against the Non-Issuer Defendants, jointly and severally with the Issuer Defendants to the extent permitted by law.

**COUNT VI**
**Civil Conspiracy**
**(On Behalf of Plaintiff and the Nationwide Class, Against the Non-Issuer Defendants)**

182. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

183. This Count is asserted against the Non-Issuer Defendants. The Issuer Defendants are alleged as primary wrongdoers and co-conspirators but are not named as defendants in this Count. To the extent Indiana law does not apply to Count VI, it is asserted under Florida law on behalf of the Florida Subclass.

184. The Non-Issuer Defendants, the Issuer Defendants, and the Unnamed Co-Conspirators agreed to deploy policyholder premiums as financing for Walter-related businesses while reporting the investments as unaffiliated and representing that the insurers' exposure was

small. The object included false regulatory filings and misleading annuity sales in violation of Indiana and, as to the Florida Subclass, Florida insurance law.

185. Overt acts included structuring loans through ABS, Amistad, Bradford Allen, and Hudson Trading Inc.; reporting them as unaffiliated; designating GPIM as unaffiliated; obtaining ratings from Egan-Jones; issuing clean KPMG audit opinions; drafting standardized materials; soliciting and issuing Annuities after subpoenas; remaining silent through refund periods; and refusing penalty-free rescission.

186. The conspiracy is not barred by the intracorporate conspiracy doctrine because Guggenheim, Egan-Jones, KPMG, the intermediary entities, and other Unnamed Co-Conspirators were separate enterprises, and Walter acted for his personal economic interests in addition to any corporate role.

187. Plaintiff and Class Members suffered damage as a direct and proximate result of the overt acts, including overpayment, diminished contract value, surrender charges, Market Value Adjustments, and loss of informed cancellation rights.

188. Each conspirator is jointly and severally liable for acts committed in furtherance of the conspiracy, and Plaintiff and Class Members seek compensatory and punitive damages accordingly.

**COUNT VII**
**Unjust Enrichment**
**(In the Alternative, On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

189. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein, and pleads this Count in the alternative to Count II if any contract is void, voidable, unenforceable, or does not bind a particular Defendant.

190. To the extent Indiana law does not apply to Count VII, it is asserted under Florida law on behalf of the Florida Subclass.

191. Plaintiff and Class Members conferred direct benefits on Defendants by paying premiums, fees, surrender charges, and Market Value Adjustments to the Issuer Defendants. Those premiums were deployed as financing for Walter-related businesses and generated benefits for the Non-Issuer Defendants and their investment managers.

192. Defendants knew of and voluntarily accepted the benefits. Delaware Life and Clear Spring retained premiums and charges; Group 1001, TWG, Walter, and related businesses received the use of policyholder capital; and Guggenheim and GPIM received or expected fees for managing or introducing investments.

193. It would be inequitable for Defendants to retain those benefits because they were obtained through concealment of the affiliated character of the assets supporting the guarantees and through exit charges imposed after the truth emerged.

194. Plaintiff and Class Members have no adequate remedy at law.

195. Plaintiff and Class Members are entitled to restitution and disgorgement of premiums, surrender charges, Market Value Adjustments, fees, and other benefits unjustly obtained, together with interest.

## COUNT VIII
### Violation of the Florida Securities and Investor Protection Act, Florida Statutes Sections 517.301 and 517.211 (In the Alternative, On Behalf of Plaintiff and the Florida Subclass, Against the Issuer Defendants and the Non-Issuer Defendants)

196. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein. Plaintiff pleads this Count solely on behalf of himself and the Florida Subclass.

197. The Annuities are securities or investment contracts within the meaning of Florida Statutes Section 517.021. Purchasers invested money in the Issuer Defendants' general accounts with an expectation of returns and guaranteed or index-linked benefits derived from Defendants' managerial and investment efforts. The statutory exemption for insurer-issued annuities from registration does not exempt them from the antifraud provisions of Section 517.301 or remedies under Section 517.211.

198. Section 517.301(1)(a) prohibits schemes to defraud, obtaining money by untrue statements or material omissions, and transactions or practices operating as a fraud or deceit in connection with the offer or sale of a security. Defendants obtained Plaintiff's and the Florida Subclass's premiums while representing that guarantees were backed by financial strength and concealing the true affiliated concentrations and investigations.

199. Under Section 517.211, the Issuer Defendants and persons who personally participated in or aided the sales are liable for rescission if the purchaser still owns the security or damages if the purchaser surrendered it. Walter, TWG, Group 1001, Guggenheim, and the Issuer Defendants participated in or aided the sales through control, standardized materials, investment structures, ratings, and continued offerings.

200. Plaintiff and Florida Subclass members who surrendered are entitled to damages, including the difference between consideration paid and amounts received, interest, and restitution of charges, which for Plaintiff total $16,602.35 ($15,325.25 surrender charge and $1,277.10 Market Value Adjustment charge). Members who still hold Annuities are entitled to rescission and return of consideration upon tender, without surrender charges or Market Value Adjustments, together with attorneys' fees under Section 517.211(6).

201. Plaintiff and the Florida Subclass seek all relief available under Sections 517.301 and 517.211, including rescission, damages, interest, fees, and costs.

**COUNT IX**
**Declaratory Judgment, 28 U.S.C. §§2201-2202**
**(On Behalf of Plaintiff and the Nationwide Class, Against the Issuer Defendants)**

202. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

203. An actual, present, and justiciable controversy exists between Plaintiff and Class Members, on the one hand, and the Issuer Defendants, on the other, concerning rights and obligations under the Annuities. Class Members who remain in force must decide whether to pay surrender charges and Market Value Adjustments to exit or remain exposed to insurers whose affiliated investments were materially misreported.

204. Plaintiff and the Nationwide Class are entitled to a declaration that: (a) the Annuities were procured by the Issuer Defendants' concealment of material facts and are voidable at the purchaser's election; (b) a purchaser who rescinds is entitled to return of premium without surrender charges, Market Value Adjustments, or other penalties; (c) charges assessed against purchasers who surrendered after June 26, 2026 must be refunded; and (d) the Issuer Defendants may not enforce exit charges to defeat rescission or return of premium.

205. Plaintiff further seeks necessary or proper relief under Section 2202, including an injunction prohibiting the Issuer Defendants from assessing surrender charges or Market Value Adjustments against Class Members who elect to rescind contracts procured by concealment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully prays for judgment against Defendants, jointly and severally, and requests the following relief:

A. An Order certifying the Nationwide Class, the Florida Subclass, the Surrendered Subclass, and the Non-Surrendered Subclass as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A judgment declaring that the Issuer Defendants breached the applicable annuity contracts and riders and that Defendants are liable to Plaintiff and the Class;

C. A judgment declaring that the undisclosed affiliated concentration materially undermined or rendered misleading Defendants' representations concerning the Issuer Defendants' financial strength and claims-paying ability, that the Annuities are voidable at the purchaser's election, and that surrender charges and Market Value Adjustments may not be enforced to defeat rescission or return of premium;

D. An award of compensatory damages to Plaintiff and the Class, including rescission and return of premiums paid or applied in each transaction without surrender charges, Market Value Adjustments, or other penalties, and an award of all such charges already paid;

E. An award of rescission, return of premium, restitution, and disgorgement under Indiana common law and, for the Florida Subclass, the Florida Securities and Investor Protection Act and Florida common law;

F. An award of punitive damages sufficient to punish Defendants and deter similar conduct, and compensatory and punitive damages against the Non-Issuer Defendants, jointly and severally, on the aiding and abetting and civil conspiracy claims;

G. Pre- and post-judgment interest at the maximum rate permitted by law;

H. An award of attorneys' fees and costs of suit;

I. An Order enjoining Defendants from concealing or misrepresenting the affiliated concentration of assets supporting annuity guarantees and from enforcing surrender charges or Market Value Adjustments to impede rescission or return of premium; and

J. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED: October 7, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON
Florida Bar No. 84824
MARK J. DEARMAN
Florida Bar No. 982407
FACUNDO M. SCIALPI
Florida Bar No. 1030791

**Stuart A. Davidson**

Stuart A. Davidson

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
fscialpi@rgrdlaw.com

Attorneys for Plaintiff and the Class